---

ZAHEER HUSSAIN,

                                        Plaintiff,

            - versus -

AUTOMOTIVE RENTALS, INC.,
COMPASS GROUP, USA, INC., and
OSMAR AGUERO-ALARCON,

                                        Defendants.

**MEMORANDUM
AND ORDER**
14-CV-7476 (JG)(PK)

APPEARANCES:

> CHERNY & PODOLSKY, PLLC
>         8778 Bay Parkway
>         Suite 202
>         Brooklyn, NY 11214
>     By:   Steven V. Podolsky
>         Aleksandr S. Cherney
>         Wayne Harris, *Of Counsel*
>         *Attorneys for Plaintiff*
>
> GORDON & SILBER, P.C.
>         355 Lexington Avenue
>         New York, NY 10017
>     By:   Jon D. Lichtenstein
>         Charles V. Weitman
>         *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

            Plaintiff Zaheer Hussain brings this diversity action against defendants

Automotive Rentals, Inc., Compass Group, USA, Inc., and Osmar Aguero-Alarcon, alleging that

their negligence caused him to be seriously injured in an automobile accident in Brooklyn on

October 1, 2013.  Hussain now moves for summary judgment on the issue of liability,

contending that defendants' negligence was the sole proximate cause of the vehicle collision.

Defendants, in turn, cross-move for summary judgment[1] on the ground that Hussain has not made a *prima facie* case of "serious injury" as defined by New York Insurance Law § 5102(d). For the reasons that follow, defendants' motion is granted, and Hussain's motion is denied as moot.

BACKGROUND

The following is based on Hussain's Local Civil Rule 56.1 statement of undisputed facts. *See* ECF No. 16-3. Any disputed facts are noted and have been viewed in the light most favorable to the plaintiff. *See, e.g.*, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

On October 1, 2013, Hussain, a livery cab driver, drove his 2010 Nissan Navigator westward on 51st Street in Brooklyn, approaching 11th Avenue. Aguero-Alarcon, a delivery truck driver employed by Compass Group, USA, Inc., drove a 2003 GMC truck filled with soda bottles behind Hussain. Aguerro-Alarcon Dep. 41:24-42:7.[2] Automotive Rentals, Inc. owned the GMC truck at the time. 51st Street is a one-way road with one lane for moving traffic and parking lanes on both sides of the street. Aguero-Alarcon observed Hussain's car stop at the red light at the intersection of 51st Street and 11th Avenue. He applied both his foot brake and emergency brake to stop his truck, *id.* 70:3-14, but he nonetheless hit the rear of Hussain's vehicle. *Id.* 56:16-19. Aguero-Alarcon estimated that Hussain's car was about two feet in front of his truck when Aguero-Alarcon began applying the brakes. There were no mechanical problems with the truck or inclement weather conditions at the time.

---

[1]    Although defendants filed their cross-motion as a motion to dismiss, it is properly construed as a motion for summary judgment.

[2]    Aguero-Alarcon's deposition is attached to the Affirmation of Samara I. Halpern ("Halpern Affirm.") as Exhibit B, ECF No. 18-4.

Hussain alleges, and defendants dispute, that he "was severely and permanently injured" as a result of the accident. Podolsky Decl., Ex. A, ECF No. 16-5, at 7.[3] Specifically, Hussain claims that the collision caused (1) his body to jerk forward and backward; (2) his left knee and left shoulder to hit the interior of his car; and (3) his head to strike his seat. Pl.'s Aff., ECF No. 19-1, at 1. He alleges that these movements caused serious injuries to his left knee, right shoulder,[4] lower back, and neck. Halpern Affirm., Ex. E, ECF No. 18-7, at 4-6. Hussain was 37 years old at the time of the accident. It is undisputed that he had no prior injuries or relevant health problems.

Immediately after the collision, Hussain called the police, who arrived at the scene. Hussain Dep. 37:7-11.[5] The police report states, "Driver 2 admitted to have hitting Vehicle 1 causing the accident." Podolsky Decl., Ex. F, ECF No. 16-10, at 2. Hussain told the officers that he felt pain in his neck, but both he and Aguero-Alarcon declined medical attention. Hussain Dep. 42:2-23. Hussain drove himself to his home in Brooklyn, took some painkillers, rested, and then drove his car to an auto repair shop in Coney Island. *Id.* 43:18-44:13.

The next day, Hussain did not go to work. *Id.* 82:6-8. According to Hussain's deposition testimony, his cousin came to see him and took him to the emergency department of New York Community Hospital. *Id.* 49:15-51:19. As defendants point out, however, the clinical notes of Hussain's emergency department visit state that he transported himself and walked into the hospital. *See* Halpern Affirm., ECF No. 18-1, at 6; *id.*, Ex. D, ECF No. 18-6, at 10.

---

[3]     For the purposes of clarity, page numbers of documents referred to in this memorandum (aside from deposition transcripts) correspond with ECF numeration.

[4]     Hussain's submissions do not clarify why, if his left shoulder struck his car, he complains of injuries to his right shoulder.

[5]     Hussain's deposition is attached to the Halpern Affirmation as Exhibit A, ECF No. 18-3.

At the hospital, the triage staff member who examined Hussain noted that his chief complaint was back pain resulting from a motor vehicle accident. Halpern Affirm., Ex. D, at 10. The staff member noted that Hussain had no unexplained bruises, sprains, or abrasions. *Id.* The examining physician recorded that "the Patient/Family Denies head injury, neck or lower back pain" and that Hussain's "symptoms are [m]ild." *Id.* at 5. The doctor further noted that Hussain's body systems, including his musculoskeletal system, appeared normal upon physical examination. *Id.* He diagnosed Hussain with a chest wall strain and prescribed him with painkillers. *Id.* at 5, 12. Hussain states that the physican instructed him to seek physical therapy if he did not feel better, Hussain Dep. 53:16-20, but no such recommendation is included in the clinical notes. Hussain went home using a car service. *Id.* 54:4-6.

Four days later, on October 6, 2013, Hussain reported to Avenue C Medical for a consultation. Podolsky Decl., Ex. B, ECF No. 19-4, at 7. He complained of neck pain, mid- and lower-back pain, bilateral shoulder pain (the right more than the left), and bilateral knee pain (the left more than the right). *Id.* The examining physician, Dr. Sayeedus Salehin, performed range of motion ("ROM") tests[6] on those areas. *Id.* at 8-10. He determined that Hussain's ROM was restricted in both his knees, shoulders, neck, and back, and ordered MRIs of his left knee and right shoulder for further analysis. *Id.*

At Dr. Salehin's recommendation, Hussain underwent physical therapy, acupuncture, and chiropractic treatment. Hussain Dep. 61:23-71:18. Hussain testified that he went to physical therapy three or four times a week for the first four or five months, and then

---

[6]     Dr. Salehin used a goniometer to measure Hussain's ROMs. A goniometer is a protractor-like instrument that can be used to measure the angle of a joint when bending, extending, or rotating. *See Goniometer*, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/goniometer.

three days a week for the next five or six months through July 2014.[7]  Hussain Dep. at 64:23-65:13; Pl.'s Aff. at 2.  He continued to see Dr. Salehin once a month and underwent MRI testing of his neck and back in addition to his left knee and right shoulder.  Hussain Dep. at 64:23-65:13; Pl.'s Aff. at 2.  Upon examining the results of the MRIs, which were completed by the end of 2013, Dr. Salehin referred Hussain to Dr. Vladimir Shur for a surgical consultation of his left knee at an unspecified time.  Podolsky Decl., Ex. B, ECF No. 19-4, at 24-25; Hussain Dep. 74:9-75:4.  Hussain reported to Dr. Shur for an initial examination on July 9, 2014, more than nine months after the accident.  Podolsky Decl., Ex. F, ECF No. 19-8, at 11.

On July 16, 2014, Dr. Shur performed arthroscopic surgery on Hussain's left knee to repair his anterior cruciate ligament ("ACL").  *Id.* at 3.  Hussain missed one week of work as a result.  Hussain Dep. 79:2-11.  After that week, he continued to experience pain and therefore did not work as many hours as usual.  *Id.*  Hussain was prescribed pain killers, equipment to enable home leg exercises, and a knee brace.  *Id.* 78:12-81:8.  He did the leg exercises for about two months and wore the brace for four to five months; Hussain continues to wear the knee brace as needed.[8]  *Id.*

Hussain asserts that his injuries continue to limit his physical abilities.  Prior to the accident, Hussain worked as a livery cab driver for approximately 60-70 hours per week.  *Id.* 23:17-21.  Now, because of the pain he feels in his lower back and left knee while driving, Hussain works for Uber approximately 45-50 hours per week.  *Id.* 24:13-25:4.  In addition,

---

[7]    Neither party has submitted Hussain's physical therapy records.

[8]    It is unclear whether Hussain began a physical therapy regimen after his surgery.  *Compare* Hussain Dep. 66:9-11 (Hussain's testimony that he did not ever receive physical therapy after his surgery) *with* Halpern Affirm., Ex. C, at 2 (noting that "[Hussain] now undergoes physical therapy after [his surgery].") *and* Podolsky Decl., Ex. F, ECF No. 19-8, at 12 (stating that Dr. Shur referred Hussain for physical therapy following his surgery).

Hussain is a member of a cricket league and used to play four times a week, but now he can play only once a week. *Id.* 82:9-84:2. He used to play two games with a hard ball and two games with a "tape ball," the latter requiring relatively more running. *Id.* He is now limited to playing with a hard ball because he cannot run as much he could before the accident. *Id.* Furthermore, Hussain is a Muslim and required to pray five times daily. Muslim prayer includes standing, bending, and prostrating. Hussain alleges that his injuries restrict him from making these movements. *Id.* 84:13-16. He cannot carry groceries or other weights when going up the stairs to his apartment.[9] *Id.* 84:20-85:10. Defendants argue that these limitations do not rise to the severity of those contemplated under New York Insurance Law § 5102(d).

Hussain originally brought this case in the New York State Supreme Court for Kings County on November 24, 2014. Defendants removed the case to this Court pursuant to 28 U.S.C. §§ 1441 and 1446(b) on December 23, 2014. These motions followed.

DISCUSSION

A. *The Legal Standard for Summary Judgment*

Under Rule 56 of the Federal Rules of Civil Procedure, a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing the suit identifies the elements of the claims asserted, and therefore indicates whether a fact is material. A fact is material if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Any "inferences to be drawn from the

---

[9]     Hussain's apartment is six stair steps above ground. Hussain Dep. 84:25-85:3

underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (alteration original; quotation marks and citation omitted); *see also Lucente v. IBM Corp.*, 310 F.3d 243, 253 (2d Cir. 2002).

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion and identifying the portions of the record that demonstrate an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).

If the movant fails to meet her initial burden, the motion will fail even if the party opposing the motion does not submit any evidentiary materials to establish a factual issue for trial. *See Adickes*, 398 U.S. at 161. If the moving party successfully carries her burden, the opposing party must then demonstrate that a genuine issue of material fact exists. *See Beard v. Banks*, 548 U.S. 521, 529 (2006). The "opponent must do more than simply show there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586-87. Ultimately, a court must grant summary judgment "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250 (citation omitted).

B.  *New York's No-Fault Insurance Framework*

Under New York law, an individual may not bring a lawsuit to recover non-economic damages arising out of negligent use of a properly-insured vehicle "except in the case of a serious injury."  N.Y. Ins. Law § 5104(a).[10]  An injury is "serious" if it falls into one of nine statutorily-defined categories, three of which are at issue in this case:

> [1] permanent consequential limitation of use of a body organ or member; [2] significant limitation of use of a body function or system; or [3] a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d).

Whether the facts of a case would support a jury's finding that a plaintiff has suffered a serious injury is a "threshold question" for the court to decide.  *See Yonq Qin Luo v. Mikel*, 625 F.3d 772, 776-77 (2d Cir. 2010).  A defendant moving for summary judgment carries the initial burden of establishing a *prima facie* case that the plaintiff did not sustain a serious injury.  *Id.* at 777.  If the defendant carries his burden, the plaintiff must then demonstrate that there is sufficient admissible evidence that she did in fact sustain such an injury.  *Id.*  Subjective complaints of pain alone cannot defeat a defendant's summary judgment motion – the plaintiff must offer objective medical evidence of a serious injury.  *Id.*; *Munoz v. Hollingsworth*, 795 N.Y.S.2d 20, 21 (App. Div. 1st Dep't 2005).  This evidence may be in the form of sworn affidavits, reports by physicians, or sworn medical test records – including MRI and x-ray

---

[10]  The purpose of New York's no-fault insurance law is "to weed out frivolous claims and limit recovery to significant injuries."  *Dufel v. Green*, 84 N.Y.2d 795, 798 (N.Y. 1995).  The law facilitiates "prompt resolution of injury claims, limiting cost to consumers and alleviating unnecessary burdens on the courts."  *Pommells v. Perez*, 4 N.Y.3d 566, 570-71 (N.Y. 2005).

results.  *See Yonq Qin Luo*, 625 F.3d at 777; *Garner v. Tong*, 811 N.Y.S.2d 400, 400 (App. Div. 1st Dep't 2006); *see also Fountain v. Sullivan*, 690 N.Y.S.2d 341, 342 (App. Div. 3d Dep't 1999).

C. *Defendants' Motion for Summary Judgment on the Issue of Serious Injury*

1. *Defendants' Prima Facie Case*

Defendants submit a number of evidentiary sources to establish a *prima facie* case that Hussain has not suffered a serious injury as defined by New York Insurance Law § 5102(d). They attach the police report, which does not note any injuries.  *See* Halpern Affirm., Ex. F, ECF No. 18-8.  They also submit the medical reports[11] from Hussain's visit to New York Community Hospital on October 2, 2013; the results of Hussain's MRIs taken between October and December 2013; and Dr. Shur's operative report for Hussain's July 16, 2014 surgery.  *See id.*, Ex. D; *see also id.*, Ex. G, ECF No. 18-9; Ex. H, ECF No. 18-10.  Defendants also append the affidavit of Dr. Calegero Gambino, an orthopedist who examined Hussain on defendants' request on July 31, 2015, and a separate report setting forth Dr. Gambino's analysis of Hussain's injuries and medical records.  *See* Gambino Aff., ECF No. 18-2; *see also* Halpern Affirm., Ex. C, ECF No. 18-5.  Finally, defendants submit both Aguero-Alarcon and Hussain's deposition testimony, as well as Hussain's answer to interrogatories regarding the collision and the severity of his injuries.  *See* Halpern Affirm., Ex. E.

---

[11]    A defendant moving for summary judgment may establish her *prima facie* case by relying on unsworn medical reports from the plaintiff's treating doctors.  *See Cody v. Parker*, 693 N.Y.S.2d 769, 770 (stating that defendant carried his burden where he relied on unsworn medical reports that failed to indicate plaintiff had suffered injuries).

a. *Hussain's Alleged Left Knee Injury*

Defendants assert that Hussain's left knee injury cannot be serious because he showed no signs of distress immediately after the accident. *See* Halpern Affirm. at 4. Shortly after he was rear-ended, Hussain exited his vehicle without difficulty and went home on his own. *Id.* When he visited the emergency department of New York Community Hospital the next day, neither the triage staff member nor the examining physician noted any knee injuries. *See id.*, Ex. D. Hussain's left knee MRI, taken three weeks after the accident, showed a partial tear of his medial meniscus and a small-sized joint effusion; however, the MRI report states that Hussain's anterior and posterior cruciate ligaments and medial collateral ligament were "unremarkable." *Id.*, Ex. G., at 2. Moreover, Hussain did not seek to have surgery until more than nine months after the car accident. Halpern Affirm. at 7. In the process of conducting arthroscopic surgery on Hussain's knee, Dr. Shur found "extreme synovitis"[12] and a "partially torn anterior cruciate ligament" – conditions that did not appear in Hussain's MRI scan – which Dr. Shur stabilized using a simple blood clotting procedure. *Id.*, Ex. H, at 3. Dr. Shur made no note of a torn meniscus.

Defendants also rely on Dr. Gambino's report. In his report, Dr. Gambino recorded that "[Hussain] states he has pain to the left knee mostly when driving greater than 5 minutes or walking greater than 1 block. He states the pain is 7-8 out of 10." *Id.*, Ex. C, at 3. The doctor measured the circumference of Hussain's left knee to be one centimeter less than that of his right knee due to "mild quadriceps atrophy." *Id.* at 4-5. Dr. Gambino also noted that Hussain's left knee flexion is 120 degrees as compared to 125 degrees on the right, but did not

_____

[12] "Synovitis is the inflammation of a synovial (joint-lining) membrane, usually painful, particularly on motion, and characterized by swelling, due to effusion (fluid collection) in a synovial sac." *Synovitis*, HealthCentral, http://www.healthcentral.com/encyclopedia/hc/synovitis-3168399/.

provide the measurement for a normal knee flexion.[13]  *Id.* at 4.  He observed no effusion[14] or erythema[15] in Hussain's left knee.  *Id.* at 4.  Dr. Shur's operative report states that Hussain's knee had synovitis and a partial tear of his ACL, but Dr. Gambino contended that "[a] dashboard injury[16] most likely would cause injury to [Hussain's] posterior cruciate ligament, however, on examination of his anterior and posterior cruciate ligaments . . . there is no evidence of instability."  *Id.* at 5.  Dr. Gambino found it significant that Hussain had not followed up with Dr. Shur or any other orthopedist despite feeling such high levels of pain.  *Id.*  He concluded that Hussain's subjective complaints of knee pain are inconsistent with the results of his physical examination, which revealed no sign of inflammation.  *Id.*  Based on his examination, Dr. Gambino stated that Hussain's left knee synovitis is "resolved."  Gambino Aff. at 2.

   b.  *Hussain's Alleged Right Shoulder Injury*

Defendants also present evidence that Hussain has not suffered a significant or consequential injury to his right shoulder.  The MRI revealed a "trace amount of fluid" in the joint and bone spurs that are "compatible with [an] anterior labral tear."  Halpern Affirm., Ex. G, at 4.  While the MRI report recommended further scans of the spurring and potential labral tear "if felt warranted on clinical grounds," *id.*, no follow-up scans were ever ordered.  Dr. Gambino

---

[13]     Courts have found such error to be cause for denial of a defendant's motion.  *See Perez v. Fugon*, 861 N.Y.S.2d 86 (App. Div. 2d Dep't 2008); *Page v. Belmonte*, 846 N.Y.S.2d 351, 352 (App. Div. 2d Dep't 2007) ("The physician's failure to set forth such a comparison requires denial of the motion.").  But even ignoring Dr. Gambino's ROM determinations, defendants present enough objective evidence to meet their burden.

[14]     "Effusion" is the collection of excess fluid around a joint.  *See Swollen Knee*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/swollen-knee/basics/definition/con-20026072.

[15]     "Erythema is a skin condition characterized by redness or rash."  *Erythema*, University of Maryland Medical Center, https://umm.edu/health/medical/altmed/condition/erythema.

[16]     Hussain has not claimed that his knee hit the dashboard of his car, but rather, that his knee hit the driver's side door.  *See* Hussain Dep. 35:22-24; Podolsky Decl., Ex. F, ECF No. 19-8, at 2 ("The impact forced his left knee to strike the door of his vehicle."); *but see id.*, Ex. B, ECF No. 19-4, at 7 ("The patient stated that his body rocked back and forth and struck the dashboard.").

noted in his report that neither of Hussain's shoulders exhibited swelling or erythema. Halpern Affirm., Ex. C, at 4. His ROMs on both shoulders appeared the same, except that the external rotation was 55 degrees on the right versus 45 degrees on the left; in other words, the right shoulder rotated further. *Id.* Dr. Gambino also performed strength testing on Hussain's shoulders. Although Hussain "would not maintain the resisitance" during this testing, Dr. Gambino stated that "he did not complain of any pain." *Id.*

### c. *Hussain's Alleged Neck and Lower Back Injuries*

Turning to Hussain's alleged neck and back injuries, the New York Community Hospital report states that "the Patient/Family Denies . . . neck or lower back pain." Halpern Affirm., Ex. D, at 5. Seven weeks later, Hussain's neck and back MRIs revealed lordosis[17] and disc bulging.[18] Halpern Affirm., Ex. G, at 5-8. Dr. Gambino examined Hussain's cervical spine and reported that his lordosis and ROMs appear normal – except that his left rotation is 60 degrees as compared to the normal range of 80 degrees. *Id.*, Ex. C, at 3. With respect to Hussain's lumbar spine, Dr. Gambino stated that Hussain's lumbar lordotic curve and movement are normal, but his forward flexion is 50 degrees as opposed to the normal range of 90 degrees. *Id.* at 4. Dr. Gambino noted that the stiffness in Hussain's neck and lower back is understandable given that he continues to spend long hours sitting in the same position as a cab driver. *Id.* at 5.

---

[17]     "Lordosis refers to the inward curve of the lumbar spine (just above the buttocks). A small degree of lordosis is normal. Too much lordotic curving is called swayback (lordosis)." *Lordosis*, U.S. National Library of Medicine, https://www.nlm.nih.gov/medlineplus/ency/article/003278.htm.

[18]     It is well-settled that evidence of herniated or bulging discs is not sufficient to prove serious injury without further objective medical corroboration of the extent of the alleged physical limitations and their duration. *See Noble v. Ackerman*, 675 N.Y.S.2d 86, 89 (App. Div. 1st Dep't 1998); *Toure v. Avis Rent A Car Systems, Inc.*, 98 N.Y.2d 345, 353 n.4 (N.Y. 2002).

Considering the evidence defendants have presented as a whole, I conclude that they have established a *prima facie* case that Hussain's injuries are not "serious" within the meaning of New York's no-fault insurance law.

2. *Hussain's Prima Facie Case*

As discussed above, the burden therefore shifts to Hussain to introduce objective medical evidence to support his claim that he has suffered serious injuries. To support his claim, Hussain submits an affidavit detailing his injuries and treatment, *see* Pl.'s Aff.; a copy of his deposition transcript; an affidavit from Dr. Salehin and certified copies of his medical records from Avenue C Medical; certified copies of his MRI reports, his electro-dagnostic study, and range of motion reports; and the affidavit of Dr. Shur with certified copies of Dr. Shur's operative records. *See* Podolsky Decl., ECF No. 19-2, Exs. A-F. For the reasons set forth below, I conclude that Hussain has failed to sustain his burden of producing evidence from which a jury could infer that he suffered a serious injury as a result of the accident.

a. *Significant Limitation of Use of a Body Function or System, or Permanent Consequential Limitation of Use of a Body Organ or Member*

The "significant limitation" and "permanent consequential limitation" categories of New York Insurance Law § 5102(d) "are often analyzed together." *Sanchez v. Travelers Cos. Inc.*, 658 F. Supp 499, 510 (W.D.N.Y. 2009). "For these two statutory categories," courts have held that the determination of whether a limitation is significant or consequential "relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part." *Toure*, 98 N.Y.S.2d at 353. Significance also entails an analysis "not only of the extent or degree of the limitation but of its duration as well." *McCleary v. Hefter*, 599 N.Y.S.2d 81, 82 (App. Div. 2d Dep't 1993) (citation omitted). To qualify for an injury under these two categories, one must

have suffered from "something more than a minor limitation of use." *Licari v. Elliott*, 57 N.Y.2d 230, 236 (N.Y. 1982).

i. *Hussain's Alleged Left Knee Injury*

Hussain alleges that the rear-end collision caused his knee to hit the interior of his driver's side door, and that the impact resulted in a serious injury. He argues that New York Community Hospital "failed to conduct any . . . diagnostic tests [other than a physical examination] in order to properly provide [him] with diagnosis of his condition." Pl.'s Opp'n, ECF No. 19, at 4. Hussain points instead to the records of Dr. Salehin, who examined him four days after his emergency department visit and noted that Hussain "complained of . . . bilateral knee pain (L>R)," seemed "severely distressed" because of his symptoms, and had an abnormal gait. Podolsky Decl., Ex. B, ECF No. 19-4, at 7-8. Dr. Salehin conducted ROM tests on both of Hussain's knees and determined that his ROMs were "restricted" to 120 degrees for each knee, as compared to the normal range of 180 degrees.[19] *Id.* at 9. His diagnostic impression was that Hussain had suffered a "[s]prain and contusion of the bilateral knee (L>R)." *Id.* at 10. He opined that "[b]ecause of the severity of [Hussain's] symptoms," he was "somewhat limited in activities of daily living," and had "difficulty bending, getting up and picking up objects." *Id.* at 11. In addition, the doctor noted that "[a]s a result of the traumatic injury[,] there were extremes of the joint movement with concomitant stretching and tearing of the musculo-ligamentous structures of the . . . bilateral knee (L>R). It appears that [this] area may[] be permanently weakened for an indefinite period of time resulting in significant and permanent restricted mobility." *Id.* Dr. Salehin recommended that Hussain see an acupuncturist, ordered an "MRI of

---

[19]　　The Center for Disease Control states that the average normal knee flexion ROM for an adult male of Hussain's age is 137.7 degrees. *Normal Joint Range of Motion Study*, Centers for Disease Control and Prevention (CDC), http://www.cdc.gov/ncbddd/jointrom/.

the left knee to rule out [a] soft tissue injury," referred him to physical therapy four times a week for three weeks, and prescribed painkillers. *Id.* at 10.

Hussain contends that over the next several months, he returned to see Dr. Salehin for follow-up appointments where the doctor performed additional ROM tests on his knees.[20] As compared to a normal flexion range (according to Dr. Salehin) of 180 degrees, Hussain's knees measured: 120 degrees on the left and 110 degrees on the right on October 28, 2013; 130 degrees on the left and 110 degrees on the right on December 9, 2013; 120 degrees on the left and 130 degrees on the right on February 9, 2014; and 120 degrees[21] on the left and no measurement on the right on September 21, 2015. *Id.* at 12-19, 25. Following Hussain's September 2015 check-up, Dr. Salehin reported that Hussain "has not demonstrated full and complete recovery and is not fully able to perform many tasks in the previous capacity as prior to the accident." *Id.* at 26. He opined that Hussain "has achieved maximum medical benefit from continuous medical intervention," but "was still complaining of residual pain and spasms in . . . [his] left knee, which was affecting [his] activities of daily living." *Id.* Without specifying the underlying reasons why, the doctor stated that Hussain's "condition is now chronic . . . and a full recovery without remission and symptoms free is highly unlikely[;]" in other words, in Dr. Salehin's estimation, Hussain "presents a permanent impairment with resultant loss of bodily functions." *Id.* at 28-29.

Hussain additionally appends the results of ROM tests[22] conducted at Avenue C Medical. *See* Podolsky Decl., ECF No. 19-2, Exs. D, E. On November 18, 2013, his left knee

---

[20]     Dr. Salehin did not conduct strength testing on Hussain's knees.

[21]     For the final examination, Dr. Salehin confusingly noted that the normal range would be 140 degrees. *Id.* at 6, 9.

[22]     These tests were conducted with a computerized method using an inclinometer, which indicates the inclination of a line to the horizontal of an axis. *See Inclinometer*, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/inclinometer.

flexion was 74 degrees and his right knee was 65 degrees, compared to a 150-degree normal range. *Id.*, Ex. E, ECF No. 19-6, at 7, 14. His total left lower extremity impairment was therefore found to be 20%. *Id.* at 13. A motor nerve study conducted on November 21, 2013 revealed evidence of tibial motor neuropathy[23] on both of his knees, as well as sural sensory neuropathy in his left knee. *Id.*, Ex. D, ECF No. 19-7, at 4. On February 17, 2014, his left knee flexion measured 76 degrees and his right knee measured 104 degrees, as compared to a 150-degree normal range. *Id.*, Ex. E, at 19, 26. His total left lower extremity impairment was thus recorded to be 20%. *Id.* at 25.

Finally, Dr. Shur's September 21, 2015 report, prepared at Hussain's request, states that Hussain consulted Dr. Shur for an initial evaluation on July 9, 2014 "because of his severe left knee pain. He rated that pain a 9 out of 10 . . . ." *Id.*, Ex. F, ECF No. 19-8, at 11. Dr. Shur stated that Hussain's left knee MRI, which suggested a meniscal tear, confirmed his mechanical findings of locking, popping, and clicking in Hussain's knee. *Id.* Hussain had been "undergoing physical therapy for about a year," which hadn't relieved his pain, so Dr. Shur "recommend[ed] . . . left knee arthroscopy." *Id.* Dr. Shur reported seeing Hussain twice after he performed surgery to stabilize Hussain's partially torn ACL. *Id.* at 12. On June 26, 2013, ten days after the surgery, Hussain complained to Dr. Shur of "mild pain," and a physical exam of the knee showed "positive minimal effusion." *Id.* Dr. Shur recommended that Hussain continue range of motion exercises and see a physical therapist. *Id.* On March 11, 2015, Hussain told Dr. Shur that he experienced pain when going up and down stairs, and sometimes his pain "on a scale from 0-10 [was] about 1-2." *Id.* Dr. Shur recommended physical therapy. *Id.* He noted

---

[23] Neuropathy is damage to nerves that can cause weakness, numbness, and pain. *See Peripheral Neuropathy*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/basics/definition/con-20019948.

that Hussain's left knee ROM had "improved" to 130 degrees, as compared to a 140-degree normal range. *Id.*

The objective medical findings of Dr. Salehin and Dr. Shur, combined with Hussain's subjective complaints of pain, fail to establish that there is a genuine issue of material fact with respect to whether Hussain's knee injury is substantial or consequential. First, despite Dr. Salehin's note that Hussain appeared "severely distressed" about his symptoms five days after the car crash, Hussain presents no objective medical evidence to explain why he was observed to be fine both immediately after the collision and the following day. Second, although courts have found that objectively measured diminutions in an individual's range of motion support a claim of serious injury, *see Toure*, 98 N.Y.S.2d at 350, most of Hussain's ROM results for his left knee appear to be at the same level – or even *better* – than his right knee ROMs. This does not support a conclusion that there is a triable factual issue regarding an impairment to his left knee resulting from the car accident. Third, Hussain's MRI indicated a meniscal tear that was not found during surgery. While the surgery did reveal an ACL tear, that was more than nine months after the car accident – it is unlikely that such an injury, if indeed caused by the collision, would go undetected for such a lengthy period of time. Moreover, the procedure was a fairly simple out-patient surgery. Hussain reported "mild" pain just ten days later and did not report undergoing physical therapy afterwards. Finally, although Dr. Salehin stated that Hussain's left knee injury is "chronic" and will cause him "permanent impairment," he did not support this contention with objective medical findings. Hussain's ability to continue working as a driver for 45-50 hours per week and to play cricket at least once a week undermine his claim that his knee injury is "serious" as defined by the no-fault law.

## ii. *Hussain's Alleged Right Shoulder Injury*

To support his claim of a significant or permanent consequential right shoulder injury, Hussain relies on Dr. Salehin's reports, his right shoulder MRI, and ROM reports from Avenue C Medical. *See* Podolsky Decl., ECF No. 19, Exs. B-E. At Hussain's initial examination, Dr. Salehin noted that he "complained of bilateral shoulder pain (R>L)" and that his "[r]ange of motion is restricted." *Id.*, Ex. B, ECF No. 19-4, at 7, 9. Upon performing an ROM test, Dr. Salehin found that Hussain's right shoulder flexion was limited to 90 degrees (normal range 180 degrees),[24] extension was limited to 40 degrees (normal range 50 degrees), and abduction was limited to 90 degrees (normal range 180 degrees). *Id.* at 9. Hussain's left shoulder flexion/extension/abduction was also limited to 120/40/100 degrees, respectively. *Id.* On the basis of this testing, Dr. Salehin diagnosed Hussain with a "[s]prain and contusion of the bilateral shoulder (R>L)," and ordered an MRI, physical therapy, and acupuncture. *Id.* at 10. According to Hussain's later ROM reports, his right shoulder flexion/extension/abduction improved from 110/40/90 on October 28, 2013, to 120/40/110 on February 9, 2014, to 170/40/170 on September 21, 2015. *Id.* at 12, 18, 28.

The improvement of Hussain's shoulder to a near-normal range of motion undermines his attempt to raise a triable issue of fact. Furthermore, Hussain's shoulder MRI revealed only a "trace" amount of fluid and a possible labral tear that was not subject to additional tests. Hussain also did not testify to perceiving sustained right shoulder pain. Therefore, I conclude that that a reasonable jury could not find that he has suffered a significant or consequential injury to his shoulder.

---

[24] The normal range of 180 degrees is according to Dr. Salehin; the CDC's average normal range for right shoulder flexion is 168.8 degrees. *Normal Joint Range of Motion Study*, CDC, http://www.cdc.gov/ncbddd/ jointrom/.

*Hussain's Alleged Neck and Lower Back Injuries*

Hussain also bases his claims of injuries to his neck and lower back on Dr. Salehin's reports, his MRIs, and the ROM reports. *See* Podolsky Decl., ECF No. 19-2, Exs. B-E. Upon conducting ROM tests at Hussain's initial examination, Dr. Salehin found that Hussain's cervical ROM was limited: extension was 20 degrees (normal range 55 degrees); flexion was 30 degrees (normal range 60 degrees); left rotation was 60 degrees (normal range 80 degrees); right rotation was 70 degrees (normal range 80 degrees); and lateral flexion was 20 degrees on both sides (normal range 40 degrees). *Id.*, Ex. B, ECF No. 19-4, at 8. His lumbar spine also appeared to be limited: extension was 15 degrees (normal range 30 degrees); flexion was 60 degrees (normal range 90 degrees); rotation was 20 degrees on both sides (normal range 30 degrees); and lateral flexion was 20 degrees on both sides (normal range 35 degrees). *Id.* at 9. Dr. Salehin conducted a straight leg test,[25] which was positive at 60 degrees on the left and 70 degrees on the right. *Id.* at 8. He diagnosed Hussain with sprains in his spinal muscles, radiculopathy, and disc displacement. *Id.* at 10.

Hussain's neck and lower back ROMs remained limited through his follow-up appointments with Dr. Salehin. On November 18, 2013, the combined percentage of impairment for his cervical spine was 18%, and for his lumbar spine was 17%. Podolsky Decl., Ex. E, ECF No. 19-7, at 13. An electro-diagnostic study conducted on November 21, 2013 showed evidence of left C5 and right C7-T1 radiculitis. *Id.*, Ex. D, ECF No. 19-6, at 14. Hussain's November 25, 2013 cervical MRI confirmed disc herniations at C2/3, C4/5, and C5/6, as well as C3/4 disc bulging, and lordosis. *Id.*, Ex. C, ECF No. 19-5, at 7. The lumbar MRI taken on the same day

---

[25] This is referred to a Lasegue's Test in the report. "A positive test may indicate sciatic or lumbosacral nerve root irritation, for example due to a prolapsed lumbar disc." *Straight Leg Raise Test or Lasegue's Sign*, Clinical Exams UK, http://www.clinicalexams.co.uk/straight-leg-raise-lasegues-test.asp.

showed lordosis at L5/S1, posterior disc bulging at L1/2 through L4/5, and subligamentous posterior disc bulging at L5/S1 and T12/L1. *Id.* at 3-4. On February 17, 2014, a ROM study revealed that Hussain's lumbar spine was limited by a total of 15%, and his cervical spine was limited by 16%. *Id.*, Ex. E, at 25. At his final appointment with Dr. Salehin on September 21, 2015, Hussain's cervical spine still appeared to be limited: extension was 30 degrees (normal range 55 degrees); flexion was 40 degrees (normal range 60 degrees); rotation was at normal levels on both sides; lateral flexion was 20 degrees on both sides (normal range 40 degrees). *Id.*, Ex. B, ECF No. 19-4, at 28. His lumbar spine was also still limited: extension was 20 degrees (normal range 30 degrees); flexion was 70 degrees (normal range 90 degrees); rotation was at normal ranges on both sides; and lateral flexion was 20 degrees on both sides (normal range 35 degrees). *Id.* Dr. Salehin concluded that Hussain has experienced a "significant loss of use of his cervical spine [and] lumbar spine," and that the injuries to his spine "can lead to interverbal disc changes . . . leading to permanent consequential disability." *Id.* at 5. Hussain testified at his deposition that he continues to feel back pain. Hussain Dep. 81:22-82:2.

 Hussain has not presented sufficient objective medical evidence of his neck and lower back injuries to present his case to a jury. It is well-settled that evidence of herniated or bulging discs is not sufficient to prove serious injury without further objective medical corroboration of the extent of the alleged physical limitations and their duration. *See Noble*, 675 N.Y.S.2d at 89; *Toure*, 98 N.Y.S.2d at 353 n.4. Here, Hussain attempts to support his case with the results of ROM studies. There is no cut-off percentage for determining whether a restricted ROM establishes a significant or permanent consequential limitation, but courts "have generally found that a limitation of twenty percent or more is significant for summary judgment purposes." *Hodder v. United States*, 328 F. Supp. 2d 335, 356 (E.D.N.Y. 2004). Hussain's electronic ROMs

on November 18, 2013 and February 17, 2014 both indicated total impairments below 20%.  In the face of these facts, Hussain has not met his burden to demonstrate that a jury could reasonably conclude that his neck and back injuries may be significant or consequential.

>    b. *Prevention from Performing Substantialy All Normal Activities for 90 Out of the 180 Days Immediately Following the Accident*

Hussain also alleges that he meets the threshold of serious injury because his injuries prevented him from "performing substantially all of the material acts which constitute his usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment."  N.Y. Ins. Law § 5102(d).  "Substantially all" means that "the person has been curtailed from performing his usual activities to a great extent rather than some slight curtailment."  *Licari*, 57 N.Y.2d at 236. To present a genuine issue of material fact on this issue, a plaintiff is required to show that the curtailment of activity he experienced is supported by objective medical evidence.  *See, e.g.*, *Blake v. Portexit Corp.*, 893 N.Y.S.2d 28, 30 (App. Div. 1st Dep't 2010) (holding that plaintiff's affidavit stating he could not play sports, had difficulty walking, going up stairs, and getting into cars, did not raise a triable issue of fact because the claims were unsupported by medical evidence).  Similarly, affirmations from medical professionals that merely confirm a plaintiff's subjective complaints are also lacking in probative value.  *See Boyd v. Pierce*, 638 N.Y.S.2d 808, 809 (App. Div. 3d Dep't 1996).

Hussain submits affidavits from both Dr. Salehin and Dr. Shur, along with their sworn medical records, to support his case on this element.  But neither doctor recommended that Hussain curtail his daily activities during the 180 days following the car accident to reduce strain on his alleged injuries.  Hussain did not miss a significant number of days from work after the accident.  He was by and large able to go about his normal routine, including continuing to

play cricket. He did not testify that any family members or friends needed to assist him with his basic needs. While his outpatient surgery required him to miss work for one week, that amount of time does not meet the threshold for a serious injury under this category.

Considering the facts presented, Hussain has not raised a genuine issue of fact requiring trial with respect to whether he was prevented from performing substantially all of his normal activities for 90 out of the 180 days following the car accident.

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted, and Hussain's motion for summary judgment is denied as moot.


So ordered.

John Gleeson, U.S.D.J.


Dated: December 30, 2015
      Brooklyn, New York